Joan B. Tucker Fife  (SBN: 144572)
jfife@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5894
Telephone:     415-591-1000
Facsimile:     415-591-1400

Amanda C. Sommerfeld (SBN: 185052)
asommerf@winston.com
Monique Ngo-Bonnici (SBN: 241315)
mbonnici@winston.com
Winston & Strawn LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Tel: 213-615-1700; Fax: 213-615-1750

*Attorneys for Defendants*,
SERVICEMASTER GLOBAL HOLDINGS, INC.,
THE SERVICEMASTER COMPANY, INC.,
THE TERMINIX INTERNATIONAL COMPANY, L.P., and
TERMINIX INTERNATIONAL, INC.

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RUBEN PABLO and BONNIE COURSEY, On Behalf Of Themselves And All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SERVICEMASTER GLOBAL HOLDINGS, INC.; THE SERVICEMASTER COMPANY, INC.; THE TERMINIX INTERNATIONAL COMPANY, L.P., and TERMINIX INTERNATIONAL, INC., and DOES 1-20, inclusive,<br><br>Defendants. | **Case No. 3:08-cv-03894-SI**<br><br>**The Honorable Susan Illston**<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>**DATE:  DECEMBER 16, 2010**<br>**TIME:   9:00 a.m.**<br><br>**RELATED CASES:**<br>No. **09-5150**<br>No. **09-5148**<br>No. **09-5152**<br>No. **09-5153**<br>No. **09-5154**<br>No. **09-4044**<br>No. **10-628** |

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 16, 2010 at 9:00 a.m. or as soon thereafter as may be heard in Courtroom 10 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants ServiceMaster Global Holdings, Inc., The ServiceMaster Company, Inc., The Terminix International Company, L.P., and Terminix International, Inc. (collectively "Defendants") will and hereby do move this Court for an order adjudicating that Defendants are entitled to partial judgment as a matter of law with respect to Plaintiff Bonnie Coursey's ("Plaintiff") claims alleging 1) misclassification and denial of overtime pay; (2) denial of meal periods; (3) denial of rest periods; (4) receipt of non-compliant wage statements; and (5) restitutionary and injunctive relief due to alleged unfair business practices pursuant to California Business and Professions Code §17200, to the extent that claim is dependent on the above theories.

This motion is made pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on the grounds that no triable issues of material fact exist as to any of the aforementioned claims for relief against Defendants, each of which depends on Plaintiff having been misclassified as exempt, and as such, Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765 (9th Cir. 1981).

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the declarations of Joan B. Tucker Fife and Andris Zoltners, Ph.D. filed concurrently herewith, the pleadings, files, and records in this matter, the oral argument of the parties at hearing on this motion, and any other matter which the Court may consider.

Dated:  September 28, 2010                  WINSTON & STRAWN LLP

                                            By:   s/ Joan B. Tucker Fife
                                                  Joan B. Tucker Fife
                                                  Attorneys for Defendants,
                                                  SERVICEMASTER GLOBAL HOLDINGS,
                                                  INC., THE SERVICEMASTER COMPANY,
                                                  INC., THE TERMINIX INTERNATIONAL
                                                  COMPANY, L.P., AND TERMINIX
                                                  INTERNATIONAL, INC.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................2

    A.   Terminix ....................................................................................................2

    B.   California's Strict Regulation Of The Sale Of Pest Control Services .......2

    C.   Under California Law, Field Representatives Play A Key Role In Pest
       Control Sales ..............................................................................................3

    D.   Plaintiff/Field Representative Bonnie Coursey ........................................4

        1.   Coursey Was Hired As A Salesperson And Was Paid Commissions............4

        2.   Coursey Was Required To Complete Extensive Sales Training .................5

        3.   Coursey Regularly Solicited New Customers.................................................5

        4.   Coursey Used Free Inspections To Secure Sales Opportunities..................6

        5.   In Her Typical Work Day, Coursey Used Inspections To Foster And
           Promote Her Own Sales................................................................................7

        6.   Coursey Also Used Inspections Reports To Foster Sales............................10

    E.   The Testimony Of Other TMX Field Representatives Confirms Coursey's
       Account Of Her Job, And Shows Her Job Duties Were Sales Or Sales-
       Related .......................................................................................................11

        1.   Field Representative Helio Costa........................................................11

        2.   Field Representative Dick Chhetri......................................................11

        3.   Field Representative Pablo Amado......................................................12

        4.   Field Representative Brian Brander.....................................................12

        5.   Field Representative Kristof Czeczko ................................................13

        6.   Field Representative Valerie Peckham ...............................................13

III. ARGUMENT.......................................................................................................13

    A.   Standard of Review..................................................................................13

    B.   Coursey Bears All The Traditional Hallmarks Of An Outside Sales Person,
       And The Policy Justifications Behind The Outside Sales Exemption All
       Apply.........................................................................................................14

i

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

C.    If Coursey's Inspections Qualify As Sales Activity, The Undisputed Facts Show She Is Properly Classified As Exempt ..........................................................16

1.    California's Outside Sales Exemption Distinguishes Between Sales And Nonsales Activity ........................................................................................17

2.    California Law Treats Activities That Directly Foster Sales As Sales Activity ...................................................................................................................18

3.    The California Pest Control Laws Recognize That Pest Inspections And Pest Control Sales Are Integrally Intertwined ...................................19

4.    The Undisputed Facts Show That Coursey's Inspections Were Intended To And Did Directly Foster Her Own Sales ..................................21

D.    Coursey's Inspection Reports Qualify As Sales Activity ........................................22

IV.    CONCLUSION...........................................................................................................................24

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT THEREOF   Case No. 3:08-cv-03894-SI

1
2

## **TABLE OF AUTHORITIES**

Page(s)

3

CASES

4   *Allstate Ins. Co. v. Madan*,
5       889 F. Supp. 374 (C.D. Cal. 1995) .......................................................................14

6   *Anderson v. Liberty Lobby, Inc.*,
7       477 U.S. 242 (1986).............................................................................................14

8   *Barnick v. Wyeth*,
        522 F.Supp.2d 1257 (C.D. Cal. 2007) ............................................................14, 15

9   *Brody v. Astrazeneca Pharmaceuticals, LP*,
10      2008 WL 6953957 (C.D. Cal. June 11, 2008) ....................................................14

11  *Harper v. Wallingford*,
        877 F.2d 728 (9th Cir. 1989) ...............................................................................14

12  *Jewel Tea Co. v. Williams*,
13      118 F.2d 202 (10th Cir. 1941) .............................................................................15

14  *Mora v. Chem-Tronics, Inc.*,
        16 F. Supp. 2d 1192 (S.D. Cal. 1998)..................................................................14

15  *Nielsen v. DeVry, Inc.*,
16      302 F.Supp.2d 747 (W.D. Mich. 2003) ..........................................................14, 15

17  *Ramirez v. Yosemite Water Co., Inc.*,
18      20 Cal.4th 785, 978 P.2d 2 (1999) ................................................................ passim

19  *Tarin v. County of Los Angeles*,
        123 F.3d 1259 (9th Cir. 1997) .............................................................................13

20  *Walsh v. Ikon Office Solutions, Inc.*,
21      148 Cal.App.4th 1440 (2007) ...............................................................................18

22  *White v. Starbucks Corp.*,
23      497 F. Supp. 2d 1080 (N.D. Cal. 2007) ...............................................................23

24  *Yacoubian v. Ortho-McNeil Pharmaceutical, Inc.*,
        2009 WL 3326632 (C.D. Cal. Feb. 6, 2009).......................................................15

25  STATUTES

26  29 C.F.R. 541.5 (1998) ................................................................................................18

27

28  Cal. Bus. & Prof. Code §§ 8500 *et seq.* .........................................................................2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

iii

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cal. Bus. & Prof. Code § 8505 .................................................................................2

Cal. Bus. & Prof. Code § 8505.2 ..............................................................................2

Cal. Bus. & Prof. Code § 8506 ...........................................................................2, 19

Cal. Bus. & Prof. Code § 8506.1 ....................................................................2, 3, 19

Cal. Bus. & Prof. Code § 8506.2 ..............................................................................2

Cal. Bus. & Prof. Code § 8507 ........................................................................2, 3, 19

Cal. Bus. & Prof. Code § 8507.1 ..............................................................................2

Cal. Bus. & Prof. Code § 8507(a) .............................................................................5

Cal. Bus. & Prof. Code § 8514 ......................................................................2, 3, 20

Cal. Bus. & Prof. Code § 8515 ...........................................................................3, 19

Cal. Bus. & Prof. Code § 8516 ......................................................................2, 3, 20

Cal. Bus. & Prof. Code § 8516.5 ............................................................................23

Cal. Bus. & Prof. Code § 8516(b) .....................................................................passim

Cal. Bus. & Prof. Code § 8516(b)(7) .......................................................................23

Cal. Bus. & Prof. Code § 8516(b)(10) .....................................................................23

Cal. Bus. & Prof. Code § 8517 ..........................................................................4, 23

Cal. Bus. & Prof. Code § 8550 ..................................................................................2

Cal. Bus. & Prof. Code § 8550(c) .....................................................................3, 4, 20

Cal. Bus. & Prof. Code § 8550(d) .....................................................................4, 20

Cal. Bus. & Prof. Code § 8551.5 ...............................................................................2

Cal. Bus. & Prof. Code § 8564.5 ...............................................................................2

Cal. Bus. & Prof. Code § 8566.5 .........................................................................2, 3

Cal. Code Regs., Title 8, § 11070 ...........................................................................18

Cal. Labor Code § 1171 ..........................................................................................17

Fed. R. Civ. P. 56(c) ........................................................................................13, 14

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT THEREOF   Case No. 3:08-cv-03894-SI

1  OTHER AUTHORITIES

2  Accuracy Plus Termite and Pest Control, *at*
3        http://www.accuracypluscalifornia.com .................................................................22

4  Anacapa Termite & Pest Control, Inc., *at*
          http://www.anacapatermite.com/201008/ipm/index.asp .........................................22
5
   Admiral Pest Control, *at*
6        http://www.admiralpest.com/orange-county-termite-control ..................................22

7  Delk Pest Control, *at*
8        http://www.delkpestcontrol.com, http://california.uscity.net/Pest Control/ ...........22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111**

1   I.   **INTRODUCTION**

2          During the time she was employed by Terminix ("TMX"), Plaintiff Bonnie Coursey

3   ("Coursey") bore all the classic features of an outside salesperson:  she spent virtually all her time

4   away from the office; she was hired as a salesperson; she was provided substantial sales training; she

5   customarily and regularly sold termite and pest control services; her compensation was based on

6   commissions; she was not closely supervised; she had substantial autonomy in determining how to

7   find sales leads; and the harder she worked, the more she sold and the more money she made.  Thus,

8   so long as Coursey spent more than half her working time engaged in sales activities within the

9   meaning of California law, she was properly classified as an exempt outside salesperson, and TMX

10  is entitled to summary adjudication in its favor on all claims that are dependent on her exempt status.

11         There is no dispute concerning Coursey's primary work activities:  she (1) attended a daily

12  sales meeting; (2) interacted face-to-face with prospective customers and attempted to sell them

13  TMX services; (3) performed termite and pest inspections; (4) drove to and between customer

14  appointments; (5) prospected for new sales leads; and (6) filled out termite inspection reports.  It is

15  indisputable that interacting with customers to make sales, prospecting for sales leads, and driving

16  time associated with sales activities all qualify as sales activity.  The record shows that these three

17  activities, combined with the time Coursey spent performing inspections, always constituted at least

18  51% of Coursey's work time.  The proper categorization of Coursey's inspections is thus the core

19  issue before the Court.

20         Coursey testified that she performed most inspections for free (*see* Declaration of Joan B.

21  Tucker Fife In Support Of Defendants' Motion for Partial Summary Judgment ("Fife Dec."), Exhibit

22  A, Deposition Transcript of Bonnie S. Coursey ("Coursey Dep.") at 71:3-19), that she used free

23  inspections as an inducement to secure sales prospects, *id*. at 130:2-5, 132:11-15, that virtually all

24  her compensation came from selling TMX services, *id*. at 35:5-7, that the purpose of inspections was

25  to find conditions that would allow her to sell, *id*. at 91:3-11, that her most successful sales pitches

26  were based on findings from inspections, *id*. at 79:4-17, 91:15-17, 104:14-22, 186:7-10, 192:22-

27  193:4, 200:20-202:11, and that she continuously sought out opportunities to perform more

28  inspections, *id*. at 238:23-239:3, even though they were uncompensated, *id*. at 71:3-19, because that

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1

is how she made sales, *id*. at 91:3-11.  Coursey's inspections qualify as sales activity because they directly promoted her own sales.  TMX is therefore entitled to summary judgment with respect to all of Coursey's claims that depend on her exempt status.

## II.  STATEMENT OF FACTS

### A.  <u>Terminix</u>

TMX is a nationwide provider of termite and pest control services.  (*See* Fife Dec., Exhibit I, Declaration of Victor Charles at ¶ 2.)  TMX is a registered pest control company in the state of California that is authorized to sell and provide termite and pest control services and operates 28 branches in California.  (*Id*. at ¶ 4.)  TMX relies on Field Representatives to sell termite and pest control services.  (*Id*. at ¶¶ 4-5.)  TMX relies on termite technicians and pest control technicians to apply termite and pest control treatments: TMX Field Representatives never apply termite or pest control treatments, and TMX technicians never sell termite or pest control services.  (Fife Dec., Exhibit J, Declaration of Robert Steve Parker at ¶ 19, Exhibit K, Declaration of Travis Southard at ¶ 30, Exhibit L, Declaration of Alberto Rios at ¶ 36.)

### B.  <u>California's Strict Regulation Of The Sale Of Pest Control Services</u>

The pest control industry is regulated by the state of California.  *See* Cal. Bus. & Prof. Code §§ 8500 *et seq*.  California's pest control laws govern both the application of pest control substances, *see, e.g., id*. at §§ 8505.2, 8507.1, 8551.5, 8564.5, and the selling of pest control services, *see, e.g., id*. at §§ 8507, 8514, 8516.

Pest control services can be offered and performed only by registered companies that are managed by licensed pest control Operators.  *Id*. at §§ 8505, 8506, 8506.1, 8550.  Operators are licensed to run pest control businesses, and may also perform the functions of Field Representatives. *Id*. at § 8506, 8506.1, 8506.2.  Field Representatives are licensed to, among other things, conduct termite and pest inspections, make representations regarding the findings of inspections, recommend pest control services, and negotiate pest control service contracts.  *Id*. at § 8507.  Applicators are licensed to perform pest control treatments.  *Id*. at § 8507.1.  An individual may hold a license to perform only one of these functions at any given time.  *Id*. at § 8566.5.  Unlicensed individuals are

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1    prohibited from performing any of the functions that licensees are authorized to perform.  *Id*. at §

2    8550(c).

3        C.    **Under California Law, Field Representatives Play A Key Role In Pest Control**

4              **Sales**

5        Registered companies cannot "commence work on a contract, or sign, issue, or deliver any

6    documents expressing an opinion or statement relating to the control of household pests, or wood

7    destroying pests or organisms until an inspection has been made."  *Id*. at § 8514.  Registered

8    companies are specifically prohibited from selling termite control services "until an inspection has

9    been made by a licensed Branch 3 field representative or operator."  *Id*. at § 8516.  A company

10   cannot express an opinion regarding whether termites or pests may be present or "recommend and

11   enter into a contract for the eradication or control of pests" until the required inspection has been

12   made.  *Id*. at §§ 8514, 8516.

13       California law recognizes that the services performed by Field Representatives include and

14   are integrally related to sales activities.  The California Business & Professional Code defines "Field

15   Representative" as "any individual who is licensed by the board <u>to secure structural pest control</u>

16   <u>work</u>, identify infestations or infections, make inspections, apply pesticides, <u>submit bids for or</u>

17   <u>otherwise contract</u>, on behalf of a registered company."  *Id*. at § 8507; *see also id.* at § 8506.1 (Field

18   Representatives "identify infestations or infections, make inspections, and <u>represent the company in</u>

19   <u>the securing of pest control work</u>") (emphasis added); *id.* at § 8515 (noting that termite and pest

20   control contracts must be negotiated by either Operators or Field Representatives).

21       After Field Representatives perform inspections, they are required by law to provide

22   customers written inspection reports that must include "[r]ecommendations for corrective measures"

23   concerning all conditions identified during the inspection.  *Id*. at § 8516(b).  Moreover, if the

24   customer so requests, the Field Representative is required to include in the report "[a]n estimate or

25   bid for repairs… separately allocating the costs to perform each and every recommendation for

26   corrective measures."  *Id*.

27       Not only are Field Representatives expected and required to make representations to

28   customers concerning the presence of pests and termites, make recommendations for corrective

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

3

measures, provide estimates for the work to be performed, and negotiate sales contracts, but they, along with Operators, are the only individuals who are **permitted** to perform those functions. Unlicensed individuals are not permitted to "offer any opinion, or to make any recommendations, concerning the need for structural pest control work," *id*. at § 8550(d), to "mak[e] any claims of pest control safety or pest control efficacy," *id*. at § 8550(c), or to "offer price quotes other than what is provided and printed on the company advertising or literature." Moreover, any "work contract… correspondence or document expressing an opinion or making a statement relating to the presence or absence of wood destroying pests or organisms or nondecay fungi" is required by law to refer to a Field Representative's or Operator's inspection report. *Id*. at § 8517.

        D.    **Plaintiff/Field Representative Bonnie Coursey**

        Bonnie Coursey worked as an outside salesperson ("OSP") at TMX's Stockton, California branch office between April 2, 2003 and June 2008. (*See* Fife Dec., Exhibit B, Declaration of Bonnie S. Coursey ("Coursey Dec.") at ¶ 1.) Coursey was licensed as both a Branch 3 and a Branch 2 Field Representative, which allowed her to sell both termite and pest control services. (Coursey Dep. at 290:25-291:4.) Coursey never performed termite treatments or fumigation work, and never did any repair work. (*Id*. at 86:13-21.)

        1.    **Coursey Was Hired As A Salesperson And Was Paid Commissions**

        When Coursey was hired by TMX to work as an OSP, she was told that she "was generally a salesperson," *id*. at 70:15-17, and that the contracts she would be selling were "outside service contracts." (*Id*. at 84:14-17.) Coursey was told that "[she] would be selling termite treatments and that's how [she] would make [her] commissions." (*Id*. at 35:5-7.) As an OSP, Coursey sold termite treatments, repair work, fumigations, and preventative warranties. (*Id*. at 86:6-9.) Coursey was paid a commission on her sales. (*Id*. at 33:1-10.) If she sold more TMX products, she made more money. (*Id*. at 70:25-71:2.) If she sold no TMX products during standard appointments, she made no money. (*Id*. at 71:3-19.) Coursey received a guaranteed $2,000 per month draw against her commissions. (*Id*. at 33:1-10.) If she made less than $2,000 in commissions in any given month, the deficit would be deducted from her future commissions. (Coursey Dec. at ¶ 5.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

OSPs may have various titles, but California law refers to employees who are licensed to perform their duties as "Field Representatives," Cal. Bus. & Prof. Code §§ 8507(a), 8516(b), and Plaintiff Coursey used the title "Field Representative" on her business card. (Coursey Dep. 289:25-290:9.) Coursey testified that she typically introduced herself to customers as a TMX field representative. (*Id*. at 45:11-15) ("Hi, I'm Bonnie. I'm Bonnie from Terminix. I'm your field representative.") Indeed, Coursey testified that when an early draft of her written declaration prepared by her attorney referred to her as a "termite inspector," she insisted that her attorney change her title to field representative. (*Id*. at 289:25-290:9.)

### 2. Coursey Was Required To Complete Extensive Sales Training

Before Coursey was allowed to begin her job as an OSP, TMX required her to complete sales training. (*Id*. at 87:21-88:3.) The sales training lasted between one and two months. (*Id*. at 88:7-10, 108:24-109:5.) Among other things, Coursey was required to complete a self-study training course on sales, *id*. at 96:8-97:5, which included modules on topics such as "Understanding Creative Sales," *id*. at 98:15-19, "The Success Attitude," *id*. at 100:17-20, "The Road to the Sale," *id*. at 101:21-24, "Finding Customers," *id*. at 101:3-7, "Prospecting Skills," *id*. at 104:3-6, "Keys to Telephone Success," *id*. at 101:18-20, "Calling Smart," *id*. at 106:8-10, "Creative Telesales," *id*. at 105:1-20, "Creating Selling Tools and Techniques," *id*. at 100:9-12, "Making the Sale," *id*. at 101:8-12, "Outbound Selling," *id*. at 102:24-103:2, "Selling the Benefits," *id*. at 103:6-9, "Handling Objections," *id*. at 103:14-17, "Focusing on the Close," *id*. at 105:21-106:7, "Closing the Sale," *id*. at 101:13-17, "Asking for Referrals," *id*. at 103:18-21, and "Referrals and Relationship Selling," *id*. at 106:11-13. She was also required to complete various sales training exercises, including sales-related role-playing, to go on at least ten ride-alongs with experienced TMX OSPs, and to complete a work booklet entitled "Terminix PACE Outside Residential Creative Sales Training Review Questions." (*Id*. at 96:23-98:14, 106:15-107:4, 110:13-19.)

### 3. Coursey Regularly Solicited New Customers

Coursey applied a variety of sales techniques to obtain additional sales leads and generate new customers. She went door to door, talked to realtors, met with realtors in their offices sometimes as many as three or four times a week, requested referrals from customers who made

5

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

purchases, called TMX customers who had purchased pest control services but had not yet bought termite service, and occasionally even called former TMX customers who had cancelled their service.  (*Id.* at 127:21-129:18, 130:9-19, 144:17-25.)  Toward the beginning of her employment, if she had extra time in the day, Coursey "would be trying to generate leads, going door to door."  (*Id.* at 147:8-148:9.)  She engaged in such door to door prospecting as much as four hours per week.  (*Id.*)  Coursey employed a prospecting technique called "cloverleafing," which involves "picking an area that [TMX] treated and going to areas around… that street or neighboring streets."  (*Id.* at 131:8-132:5.)  Coursey's favorite and most successful method of soliciting new customers was sending out letters offering a free termite inspection to homes in the general area of a property that had recently been treated.  (*Id.* at 129:25-130:-8, 134:3-7, 149:4-11.)  Coursey sent solicitation letters out as often as on a weekly basis.  (*Id.* at 134:11-13.)

Coursey scheduled appointments with both residential and commercial accounts.  (*Id.* at 287:17-25.)  Coursey typically secured additional commercial business through calls to the office, by conducting escrow inspections, and by getting referrals from residential customers who also wanted their place of business inspected.  (*Id.* at 292:11-17.)

### 4.    Coursey Used Free Inspections To Secure Sales Opportunities

Coursey testified that her purpose in making appointments was "[t]o do a termite inspection," and that her purpose in doing termite inspections was "[t]o try to find termites or something other than that <u>that I could make some money on</u>."  (*Id.* at 91:3-11 (emphasis added).)  If Coursey found evidence of infestation during an inspection, she attempted to make money by selling treatment services.  (*Id.* at 91:12-21.)  If Coursey did not find evidence of infestation during an inspection, she attempted to make money by selling a preventative plan.  (*Id.*)

Even though Coursey was not paid anything at all for doing standard inspections,[1] she constantly tried to schedule additional inspection appointments, *id.* at 238:23-239:3 ("If I had less

---

[1] In addition to standard appointments, Coursey also did escrow inspections for home sales, re-inspections that followed up on the findings of escrow inspections, and renewal inspections for existing TMX customers.
- When Coursey did escrow inspections, she received a percentage of the flat TMX inspection fee, *id.* at 87:7-10, and also attempted to sell TMX services, *id.* at 87:11-14.  Coursey successfully used escrow inspections to sell TMX services.  (*Id.* at 78:11-15.)  If Coursey

6

appointments, I was always trying to make more appointments"), because she knew that the free

inspections would help her close additional sales and make more money.  (*Id*. at 91:3-11.)  Coursey

testified that she used the fact inspections were free to induce homeowners to allow her in to do the

inspections.  (*Id*. at 132:11-15.)  Thus, all of Coursey's solicitation letters offered a free termite

inspection.  (*Id*. at 130:2-5.)  When Coursey went door to door engaging in cloverleafing

prospecting, she typically initiated conversations with prospective customers by noting that there

was a possibility they might have an infestation and then offering to do a free inspection.  (*Id*. at

132:2-5.)  These activities all generated additional appointments for Coursey.  (*Id*. at 140:5-12.)

> 5.  **In Her Typical Work Day, Coursey Used Inspections To Foster And Promote Her Own Sales**

According to Coursey, she typically arrived at the office each morning at 7:30 a.m.  (*Id*. at

155:18-20.)  She then typically had a thirty minute meeting with her branch manager at which sales

numbers, sales activities, and areas for sales improvement were discussed.  (*Id*. at 155:24-156:3,

157:20-25,162:4-9, 163:11-13.)  Coursey then picked up her appointment and schedule book, and

occasionally also picked up some graph paper and blank inspection paperwork, and left for her

inspections.  (*Id*. at 165:6-21.)  Once Coursey left the office, she was generally free of supervision.

She was not required to check back into the office during the day, to report her whereabouts, or to

sold services during an escrow appointment, she received a commission on her sales.  (*Id*. at 87:15-18.)  In many months Coursey had no escrow sales.  (*Id*. at 72:18-20.)  At most, Coursey had ten escrow appointments in a month.  (*Id*. at 72:21-22.)  Coursey estimated that when she found termites during an escrow inspection, she sold termite services about 80 percent of the time, and when she found termite damage during an escrow inspection, she sold repair services about 40 percent of the time.  (*Id*. at 79:7-17.)

- Coursey had fewer re-inspections than she had escrow inspections, because the purpose of re-inspections was to determine whether any conditions found during an initial escrow inspection had been corrected, and not all escrow inspections had findings.  (*Id*. at 77:10-19.)  Coursey testified that re-inspections provided her additional sales opportunities and generated additional business, *id*. at 104:9-13, and that if she found an infestation or a conducive condition during a re-inspection, she would attempt to make a sale.  (*Id*. at 104:14-22.)

- For renewal inspections, Coursey received a flat fee of $10 in addition to the opportunity to sell TMX services the customer had not yet purchased.  (*Id*. at 201:8-20, 275:14-17.)  In any given month, Coursey testified that she had between 1 percent and 50 percent renewal inspections.  (*Id*. at 76:25-77:2.)

7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

return to the office when the day ended.  (*Id*. at 241:10-22.)  Coursey testified that she alone judged

what she needed to do to make her money and how she should go about doing it.  (*Id*. at 242:2-5.)

After leaving the office, Coursey typically drove to her first inspection appointment.  (*Id*. at

167:1-5.)  Coursey's original territory consisted of the northern part of Stockton, California, and

spanned a range of about ten miles total from north to south.  (*Id*. at 168:11-169:20.)  Coursey's

driving time to her first appointment, as well as her driving between appointments, was typically

between 20 and 30 minutes.  (*Id*. at 175:9-176:4.)  On two occasions during her employment with

TMX, Coursey's territory was expanded northward to include Galt and the surrounding mountains

and foothills.  (*Id*. at 170:6-172:14.)  During those times, the maximum driving time it took Coursey

to get to an appointment was two hours.  (*Id*. at 175:22-176:4.)

Toward the beginning of her employment, Coursey was required to have at least three

inspection appointments per day.  (*Id*. at 167:12-16.)  Later, that number was increased to four.  (*Id*.

at 167:6-11.)  During the subterranean termite swarm season, which started in March and ended in

June or July, *id*. at 150:14-23, Coursey typically had between three and six sales appointments per

day.  (*Id*. at 153:6-25.)

Upon arriving at an appointment, Coursey would review her scheduling and appointment

book to determine whether the appointment was with a new or existing customer.  (*Id*. at 178:14-

179:4.)  She did not typically do any other preparatory work before knocking on the door.  (*Id*. at

179:5-9.)  Next, Coursey would knock on the door and spend some time introducing herself and

establishing rapport with the potential customer.  (*Id*. at 122:9-12, 179:20-180:16.)  Coursey felt it

was important to establish a good rapport with customers at the beginning of sales appointments, *id*.

at 122:6-8, primarily because Coursey believed that establishing a good rapport would increase her

likelihood of making sales.  (*Id*. at 122:9-12.)  Coursey often led off her meetings with potential

customers with a joke to put them at ease.  (*Id*. at 122:13-123:4, 180:8-16.)  She also informed the

potential customer of her qualifications and asked whether they had any specific areas of concern.

(*Id*.)  When TMX trainees accompanied Coursey on sales appointments, she told them that it was

important to establish rapport with prospects and allowed them to observe her establishing rapport

with potential customers.  (*Id*. at 121:17-20, 118:1-3.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

Coursey then conducted the physical inspection.  (*Id*. at 185:6-186:10.)  She would start by looking at any areas of concern identified by the potential customer.  (*Id.* at 185:11-14.)  She would then typically go outside, take measurements, and make a drawing of the property, getting the linear measurements required for potential treatment.  (*Id*. at 185:15-18.)  If there was a crawl space beneath the house, Coursey would inspect that, and would then move through the interior of the home.  (*Id*. at 185:19-186:6.)

After the inspection was completed, Coursey "would find the customer and walk them around and show them any areas that I could that I have found, and talk with the customer about my findings and, if necessary, treatment."  (*Id*. at 186:7-10.)  Coursey's findings could range from termite or pest infestations to conducive conditions to shower leaks that required repair work, any of which enabled her to sell TMX services.  (*Id*. at 186:11-189:15.)  As Coursey conducted the inspection she took detailed notes on what she found and where, so that she could then show the customer as much of what she had found as possible.  (*Id*. at 192:17-193:11.)  Coursey attempted to sell the customer TMX services to address whatever conditions she found.  (*Id.* at 200:15-201:12.)  If she did not find any conditions, she would recommend that the customer purchase a preventative plan.  (*Id*. at 201:17-202:11.)  The selling of preventative plans particularly required the exercise of persuasion.  (*Id*. at 298:5-23.)  To secure sales, Coursey explained TMX's history and reputation as a company.  (*Id*. at 203:20-24.)  She also provided a detailed explanation of the treatment process.  (*Id*. at 204:4-7.)  Coursey's sales pitches were not scripted, and varied depending on the customer.  (*Id*. at 206:8-23, 207:9.)  Older customers, for example, typically required longer sales pitches with more detailed explanations.  (*Id*.)  Sometimes Coursey persuaded customers to make purchases by offering financing options.  (*Id*. at 206:24-207:4.)  If customers objected to the cost of TMX services, she attempted to secure the sale by explaining "the professionalism of the contractor that did our contract, our work, the warranty that they would receive."  (*Id*. at 81:15-23.)  If Coursey sold a service, she would write up a contract for the customer, which she estimated took between three and ten minutes.  (*Id*. at 208:15-209:5.)

After an inspection appointment, Coursey would place her notes from the inspection in a folder in her car and then drive to the next appointment.  (*Id*. at 196:21-197:21.)  If she had free time

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT THEREOF  Case No. 3:08-cv-03894-SI

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

due to a canceled appointment or a gap in her schedule, Coursey would make prospecting calls from her cell phone to realtors or potential customers, stuff solicitation letters into envelopes, go door to door, or possibly head home or back to the office early.  (*Id.* at 198:14-200:14.)  She might also work on filling out inspection reports, *id.* at 198:23-199:1, although she typically filled those out in the evening.  (*Id.* at 211:6-16.)  After her final appointment for the day, Coursey would either return home or return to the office, depending on the time of day and her personal and professional obligations.  (*Id.* at 236:19-237:22.)  Coursey never made prospecting calls from home.  (*Id.* at 238:15-17.)

### 6.    Coursey Also Used Inspections Reports To Foster Sales

Coursey testified that if a homeowner did not purchase any TMX services after an inspection, she "would usually thank then for their time and would usually contact them again to check with them."  (*Id.* at 209:6-13.)  Coursey used this post-inspection contact with homeowners to attempt to close sales.  (*Id.* at 209:14- 17.)  Coursey also told the homeowner that they would be receiving a follow-up copy of an inspection report.  (*Id.* at 210:4-6.)  The inspection report noted conditions that Coursey had identified during her inspection, such as the presence of subterranean termites or fungus, *id.* at 213:16-22, and also included specific recommendations as to how those conditions should be addressed.  (*Id.* at 227:21-228:11.)  Customer follow-up of this nature is a standard component of most sales jobs.  (*See* Declaration of Andris A. Zoltners, Ph.D. In Support of Defendants' Motion for Summary Judgment ("Zoltners Dec.") at ¶ 21.)  The inspection reports, which include notations of findings as well as recommendations concerning how to address them, serve as "sales process enhancers" that remind homeowners of their particular needs and increase the overall probability of success in making a sale.  (*Id.* at ¶ 21, 22.)

Coursey estimated that the typical inspection report took 20-30 minutes to complete, and that the longest reports took about two hours.  (Coursey Dep. at 216:25-217:16, 218:11-15.)  It would then be submitted to a TMX typist to finalize the report, which typically took between two and three days.  (*Id.* at 221:5-9.)  When the typist finished the report, Coursey would proof it, which Coursey estimated took 5 to 10 minutes for an average report, and at the longest took 20 minutes.  (*Id.* at

1  235:9-22, 229:10-15.)  Coursey was not generally responsible for mailing the reports.  (*Id.* at 236:15-

2  18.)

3      E.   **The Testimony Of Other TMX Field Representatives Confirms Coursey's**

4           **Account Of Her Job, And Shows Her Job Duties Were Sales Or Sales-Related**

5          Several TMX Field Representatives have provided testimony confirming that being a Field

6  Representative is a sales job, and that the job duties performed by Coursey are either sales or sales-

7  related.  For example:

8      1.   *Field Representative Helio Costa*

9          Costa testified that prior to working as a Field Representative for TMX, he worked as a

10  "flooring salesman" for eight years.  (Fife Dec., Exhibit C, Deposition Transcript of Helio Costa

11  ("Costa Dep.") at 13:13-14.)  Because of his sales background he was offered a position "as an

12  outdoors salesperson doing inspections and selling jobs to customers."  (*Id.* at 46:20-47:13.)  When

13  Costa was hired as an OSP, his manager told him that he would be expected to spend more than half

14  of his workdays outside of the office and his home doing sales work.  (*Id.* at 208:10-209:8.)  Costa

15  now works as a Reinspector for Terminix because he "did not want to do sales anymore."  (*Id.* at

16  14:9.)  When asked about his time as an OSP, Costa stated: "I am a salesperson . . . when I was hired

17  on [at Terminix], I was hired on as a salesperson."  (*Id.* at 22:18-21.)  When asked whether he

18  considered the physical inspection a sales tool, Costa stated yes, and testified that without the

19  physical inspection, it would be impossible to make a sale: ". . . people aren't just going to say, 'Oh,

20  yeah. Looks like you have termites.  Here, let me sell you this service.' That ain't going to work."

21  (*Id.* at 201:15-20.)

22      2.   *Field Representative Dick Chhetri*

23          Chhetri testified that before accepting his position as an OSP, his manager made it clear to

24  him that the job was a "sales job."  (Fife Dec., Exhibit D, Deposition Transcript of Dick Chhetri

25  ("Chhetri Dep.) at 121:11-17.)  When asked whether he considers the physical inspection to be a

26  sales tool, Chhetri stated yes, and added that ". . . unless we inspect [the home], how do you find the

27  problem? Unless you find the problem, how do you sell?"  (*Id.* at 123:25-124:7.)  Chhetri testified

28  that he spends 1-2 hours conducting physical inspections so that he can point out termite infestation

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111*

11

in order to gain his customers' trust.  (*Id.* at 124:5-22; 144:6-13.)  When asked, "[s]o one of the reasons why you take so long on your inspections is because you think it will help you sell the product at the end, is that right?" - Chhetri answered with a resounding: "Absolutely."  (*Id.* at 144:17-21.)

### 3.   *Field Representative Pablo Amado*

Amado testified that his interactions with homeowners during inspections are for the purposes of "building rapport" in order to "close the deal" and make a sale.  (Fife Dec., Exhibit E, Deposition Transcript of Pablo Amado ("Amado Dep.") at 213:10-22.)  Thus, Amado testified that he tries to "bring life to his inspections" by constantly interacting with the homeowner during the inspection process.  (*Id.* 213:6-22.)  Amado testified that he uses every opportunity to "call out to the customer" to tell them where he is in the house, and tell them to come observe his findings.  (*Id.*)  By doing this, Amado testified that the physical inspection "creates more of an opportunity" to sell because, "if you don't go under the house, you'll never know if there was a plumbing leak. You'll never know is there is subterranean [termite infestation].  So there's money there, and you've got to go find it."  (*Id.* at 416:7-13.)   When asked how he views the physical inspection aspect of his job, Amado agreed that he viewed it as an "extended sales pitch" and for that reason he will "invite [his] customer as much as possible to be a part of the inspection."  (*Id.* at 419:8-420:20.)  Amado affirmed that he considers himself to be a salesperson; that he believes his primary duty as an OSP is to sell for Terminix; and that he considers the physical inspections and report writing aspects of his job to be sales activities.  (*Id.* at 438:10-23.)

### 4.   *Field Representative Brian Brander*

Brander testified that he began working for TMX as a Reinspector, but transitioned to the Field Representative position upon the recommendation of his manager because he was the top salesman at his branch.  (Fife Dec., Exhibit F, Deposition Transcript of Brian Brander ("Brander Dep.") at 259:22-260:6.)  Brander testified that as a salesman he is "always trying to sell something," *id.* at 259:5-9, and that even though he is no longer a Reinspector, he still views reinspections as a way to make a sale and make money.  (*Id.* at 274:19-275:13.)  Brander invites every homeowner to accompany him on his physical inspections because "in [his] experience" it will

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

increase his chance of making a sale because he can converse with the customer and make his sales pitch.  (*Id.* at 275:22-278:7.)

### 5.   *Field Representative Kristof Czeczko*

Czeczko testified that when he filled out his employment application it was clear to him that that he was applying for a job in sales.  (Fife Dec., Exhibit G, Deposition Transcript of Kristof Czeczko ("Czeczko Dep.") at 55:24-56:7.)  Czeczko testified that when he filled out an application for employment with TMX, he listed the position he was applying for as "outside sales."  (*Id.* at 55:7-11.)  When he interviewed for his Field Representative position with TMX, Czeczko was asked what success in his job would mean.  Czeczko testified that, at the time, he believed success meant "selling the most I can."  (*Id.* at 64:3-7.)  Czeczko admitted that he is a commissioned employee.  When asked how he earns commissions he replied, "[b]y making sales."  (*Id.* at 52:20-21.)  Czeczko admitted that, with the exception of pest control services, unless he does a physical inspection, he cannot make recommendations as to what service is correct for a customer's needs.  (*Id.* at 49:1-52:9.)

### 6.   *Field Representative Valerie Peckham*

When asked, "Was it your job to sell []?" Peckham answered with an unequivocal, "Yes." (Fife Dec., Exhibit H, Deposition Transcript of Valerie Peckham ("Peckham Dep.") at 36:10-11.) Peckham further testified that without inspecting a home, it would be "impossible" to determine what to sell a client.  (*Id.* at 40:8-11.)  Peckham testified that she received "ongoing" sales training as a Field Representative and that she used TMX's "five point sales formula" to sell TMX's products and services to customers who had termite and pest infestations.  (*Id.* at 41:5-42:1.)  With respect to the physical inspection, Peckham testified, "Do a good inspection, and you have a very good chance of selling . . . the inspection is what gets the sale."  (*Id.* at 64:1-2, 4.)

## III.   ARGUMENT

### A.   <u>Standard of Review</u>

Summary judgment must be granted where the evidence before the Court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.

13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1997).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" cannot defeat a motion for summary judgment.  *See Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).  Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. *See* Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim…may…move…for a summary judgment in the party's favor upon all or any part thereof."); *see also Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  *See* Fed. R. Civ. P. 56(a), 56(c); *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

B.    **Coursey Bears All The Traditional Hallmarks Of An Outside Sales Person, And The Policy Justifications Behind The Outside Sales Exemption All Apply**

Federal and state courts have identified five key indicia of outside sales status:  (1) the job was advertised as a sales position, (2) the employee was provided specialized sales training, (3) the employee was compensated wholly or in significant part based on commissions, (4) the employee independently solicited new sales, and (5) the employee received little or no direct constant supervision carrying out daily work tasks.  *See, e.g., Barnick v. Wyeth,* 522 F.Supp.2d 1257, 1262 (C.D. Cal. 2007) (applying these factors in outside sales case decided under California law); *Brody v. Astrazeneca Pharmaceuticals, LP*, 2008 WL 6953957 at \*6 (C.D. Cal. June 11, 2008) (using factors in outside sales case applying California law); *Nielsen v. DeVry, Inc*., 302 F.Supp.2d 747, 756-58 (W.D. Mich. 2003).  All five indicia apply to Coursey's employment as a TMX Field Representative:  Coursey was hired as a salesperson, *Coursey Dep.* at 70:15-17, received extensive sales training, *see supra* at II(D)(2), received compensation that was primarily based on commissions, *id.* at 33:1-10, 35:5-7, 70:25-71:19, independently solicited new sales, *see supra* at II(D)(3), and had significant autonomy:  she was not required to check in once she left the office, *id.* at 241:10-22, and judged for herself what she needed to do to generate more sales and make more money.  (*Id*. at 242:2-5.)

14

It is particularly worthy of note that Coursey was compensated almost entirely through commissions that she earned by selling TMX products.  (*Id.* at 33:1-10, 35:5-7, 70:25-71:19.)  If she sold more TMX products, she made more money.  (*Id.* 70:25-71:2.)  If she sold no TMX products, she generally made no money.  (*Id.* 71:3-19.)  This kind of commission-based compensation system has long been recognized by the courts as a hallmark of outside sales positions.  *See, e.g., Barnick*, 522 F.Supp.2d at 1263 ("Most significantly, Plaintiff's pay was determined at least in part on the basis of sales he generated."); *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941) ("In lieu of overtime, he ordinarily receives commissions as extra compensation.").

Federal courts and the California Division of Labor Standards Enforcement have provided similar policy explanations concerning why outside sales employees are exempt from overtime requirements:

- Outside salesmen have historically been exempt "because it's very difficult to control their hours and working conditions.  They set their own time, and they're on the road, they call on customers. … [R]arely [does the employer] know what they're doing on an hour-to-hour basis."  DLSE Op. Letter, Sept. 8, 1998, *quoting* Transcript of IWC Meeting 2/23/96, p.148.

- The reasons for excluding an outside salesman are fairly apparent.  Such salesmen, to a great extent, work individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation.  He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hourse he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.  *Jewel Tea Co.*, 118 F.2d at 207-08 (10th Cir. 1941), *quoted in Barnick*, 522 F.Supp.2d at 1262.

- They received compensation as a result of their sales activities.  If they hustled more [they] made more.  The object of their harder work wasn't to garner overtime, it was to generate sales.  *Yacoubian v. Ortho-McNeil Pharmaceutical, Inc.*, 2009 WL 3326632 at *3 (C.D. Cal. Feb. 6, 2009).

While California law requires a quantitative analysis of Coursey's work to determine whether she qualifies for the outside sales exemption, *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785 (1999), she falls squarely within the policy rationale supporting exempt status.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

C.   **If Coursey's Inspections Qualify As Sales Activity, The Undisputed Facts Show She Is Properly Classified As Exempt**

Coursey testified that her work days consisted of six primary activities:  (1) attending a daily sales meeting, *Coursey Dep.* at 155:18-20; (2) interacting face-to-face with prospective customers and attempting to sell them TMX services, *id.* at 122:6-12, 179:20-180:16, 186:7-189:15, 192:17-193:11, 200:15-202:11; (3) performing termite and pest inspect inspections, *id.* at 185:6-186:10; (4) driving to and between customer appointments, *id.* at 167:1-5, Coursey Dec. ¶ 8; (5) prospecting for new sales leads, *Coursey Dep.* at 127:21-132:5, 134:3-13, 144:17-25, 147:8-148:9, 149:4-11; and (6) filling out termite inspection reports, *id.* at 211:6-16, 216:25-217:16, 218:11-15.  Her typical work day began with a sales meeting that lasted approximately 30 minutes.  (*Id.* at 157:11-3.)  The rest of her typical work day consisted of a series of appointments, time spent driving to those appointments, time spent prospecting, and time spent writing reports, which she usually did in the evening.  Appointments consisted of three standard segments:  an initial meeting with the customer at which rapport was established, an inspection of the property, and then a sales pitch during which findings from the inspection were reviewed with the customer.  *See supra* at II(D)(5).

The California Supreme Court expressly held in *Ramirez* that driving time that is necessary to the performance of sales activities qualifies as sales activity.  *Ramirez,* 20 Cal.4th at 802.  If both sales and nonsales activities are performed during an appointment, the associated driving time must be apportioned between the activities.  *Id.*  There can be no serious dispute that the time Coursey spent at the beginning of appointments building rapport, and at the end of appointments making her sales pitch, qualifies as sales activity.  Thus, if Coursey's inspections also qualify as sales activity, then all three segments of Coursey's appointments are sales activity, and under *Ramirez*, all the time that Coursey spent driving to appointments would qualify as sales activity as well.

According to Coursey, she completed between three and six appointments per day, and during most of her employment was required to schedule at least four appointments per day.  (Coursey Dep. at 153:6-25, 167:6-16.)   Coursey testified that each appointment, including all three segments mentioned above, plus report writing, plus driving time, took on average three hours to complete, and on occasion as many as five hours.  (Coursey Dec. ¶ 8.)  She further testified that it

16

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

took her between 30 and 40 minutes to write an inspection report, *Coursey Dep.* at 216:25-217:16, and an additional 5 to 20 minutes (usually a few days later) to proof an inspection report once it was completed by a typist.  (*Id.* at 235:9-19.)  Thus, even if this court were to determine that report writing is nonsales activity – which, as is explained in section III(E) below, is not the case  – Coursey spent at most 33 percent of the time attributable to any given appointment on writing and proofing the inspection report.[2]  That means that even if this Court were to determine that Coursey's 30 minute morning sales meeting also constituted nonsales activity – a point TMX again does not concede – and even if Coursey went on only three appointments in a day, at least 60 percent of her time on that day would be spent on sales activity.[3]  With a greater number of appointments, the percentage of sales activity would increase.  Thus, a determination that Coursey's inspections constituted sales activity would definitely resolve her exempt status.[4]

       1.      **California's Outside Sales Exemption Distinguishes Between Sales And Nonsales Activity**

        Under the California Labor Code, outside salespersons are not entitled to overtime.  Cal. Labor Code § 1171.  An outside salesperson is defined as "someone who 'regularly works more than half the working time' engaged in sales activities outside the workplace."  *Ramirez*, 20 Cal. 4th at

---

[2] 40 minutes at most to fill out the report, plus 20 minutes at most to proof the report, out of a 180 minute appointment.
[3] Three appointments totaling at least 540 minutes, plus a 30 minute sales meeting for a 570 minute work day, out of which 180 minutes at most was spent filling out reports.
[4] Even if there were one or more weeks in which Coursey did not spend at least 51% of her time performing inspections, making sales pitches, prospecting for sales leads, and driving to and from appointments, she would still qualify as an exempt outside salesperson during those weeks.  "[A]n employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption."  *Ramirez*, 20 Cal.4th at 802.  *Ramirez* instructs trial courts to "inquir[e] into the *realistic* requirements of the job" and to "consider whether the employee's practice diverges from the employer's realistic expectations… ."  *Id.*  Here, the only activities that Coursey performed other than inspections, making sales pitches, prospecting for sales leads, and driving to and from appointments, were (1) attending a daily 30 minute sales meeting and (2) filling out termite inspection reports.  *See* Section III(C) at p. 13, *supra*.  Even if it is determined that those activities do not qualify as exempt sales activity – a point that TMX does not concede – TMX was certainly reasonable in expecting that those two very limited activities would never constitute half of a Field Representative's weekly work time.  The job of being a Field Representative realistically requires employees to spend a substantial majority of their time engaging in sales activity – identifying sales leads, making appointments, performing free inspections, and then using the inspections to close sales – and under *Ramirez*, TMX is entitled to rely on those realistic requirements in treating them as exempt outside salespersons.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

789, *quoting* Cal. Code Regs., tit. 8, § 11070.  To qualify for the California outside sales exemption, an employee must spend a majority of his or her working time performing sales related activities. *Id*. at 852.  Under California's "distinctive quantitative approach" to determining eligibility for the outside sales exemption, a court is required to "itemize the types of activities that it considers to be sales related, and the approximate average times that it finds the employee spent on each of these activities." *Id*. at 801, 803 n.5.  A court called upon to evaluate application of the outside sales exemption to an employee with a mixture of duties must distinguish between "sales and nonsales" duties in performing this quantitative analysis.  *Id*. at 790; *see also id*. at 801 ("But if, as in the present case, an employee travels to a destination to engage in both <u>sales and nonsales activities</u>, the travel time must be apportioned among the two types of activities… .") (emphasis added).

> ## 2.  California Law Treats Activities That Directly Foster Sales As Sales Activity

Under California law, "sales activity" within the meaning of the outside sales exemption is not limited to time spent writing sales contracts or otherwise engaging in actual sales transactions. Rather, "sales activity" includes all activities that directly foster sales or that are necessary to complete sales transactions.  Thus, for example, even though driving time has no intrinsic sales value, "[i]f a salesperson must travel one hour to destination A in order to attempt a sale, then surely the most reasonable interpretation of the wage order is to count the hour of travel time as time spent 'selling.'"  *Ramirez*, 20 Cal.4th at 801.  California courts refer to activities that are "sales related," *id.* at 803 n.5, "directly related to sales," *id.* at 797, "related activities," *id*. at 855, and activities that are "used as part of… selling activities," *Walsh v. Ikon Office Solutions, Inc.*, 148 Cal.App.4th 1440, 1456 (2007), all as "sales activities" within the meaning of the outside sales exemption.

Nonsales activities, by contrast, do not count toward the outside sales exemption.  This limitation excludes some tasks that would qualify as exempt "sales activity" under federal law because, as the California Supreme Court noted in *Ramirez*, the federal overtime regulations broadly treat all work that is "performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections," as exempt outside sales work. 29 C.F.R. 541.5 (1998), *quoted in Ramirez*, 20 Cal.4th at 801.  Whereas federal regulations

18

1   expressly treat even <u>nonsales</u> work (such as delivering preordered products) as exempt outside sales

2   work whenever it is performed "incidental to and in conjunction with" a sale, *Ramirez* held that such

3   nonsales activities, which have no direct impact on or relationship with actual sales, cannot be

4   counted toward the California outside sales exemption. *Id*. at 802. Activities that are "related" to

5   sales, however, in the sense that they either directly foster sales or are necessary to complete sales,

6   are treated as sales activities under California law. *Id*. at 801. "[P]reparation, travel time, and

7   paperwork" all fall into this category. *Id*.

8          3.     **The California Pest Control Laws Recognize That Pest Inspections And**

9                 **Pest Control Sales Are Integrally Intertwined**

10        The language and structure of California's pest control laws make it clear that California has

11   long recognized that pest inspections and pest control sales are integrally intertwined, and that Field

12   Representatives do in fact typically perform the functions of outside salespersons. In the first

13   instance, the titles used by the pest control statutes speak volumes, and it is no accident that the

14   statutes describe Field Representatives as representing pest control companies to potential customers

15   and selling treatment services. Cal. Bus. & Prof. Code §§ 8506, 8506.1, 8507, 8507.1. Indeed, most

16   of the functions ascribed to Field Representatives by the statute are classic outside sales activities,

17   such as submitting bids on behalf of pest control companies, *id*. at § 8507, representing the company

18   in securing pest control work, *id.* at § 8506.1, and negotiating pest control contracts, *id*. at § 8515.

19        Not only does the statute express an understanding that the job of being a Field

20   Representative is a sales job, however, but it also shows a clear understanding that Field

21   Representative inspections are essential to and intertwined with pest control sales. While companies

22   are always in search of that elusive product that "sells itself," the reality is that selling products and

23   services almost always requires persuasion, which is why our society is filled with salespersons and

24   inundated with advertisements. To sell a service, a company needs to convince a customer (1) that

25   the customer needs the service, and (2) that the particular service offered is of high quality, is

26   competitively priced, and will satisfy the need. (Zoltners Dec. at ¶ 16 ("You can't sell without

27   identifying a need, helping a customer or prospect see the need, and providing customer solutions

28   that satisfy those needs and solve their issues.").) Under the California pest control laws, Field

19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1  Representatives necessarily play an essential role in performing these persuasive functions.  No sale

2  can be made until an inspection has been completed.  Cal. Bus. & Prof. Code at §§ 8514, 8516.

3  Indeed, a company is not even permitted to make any recommendations or to offer any opinions with

4  respect to pests or termites until an inspection has been done.  Furthermore, the inspection reports

5  completed by Field Representatives are required under California law to make representations

6  concerning any conditions identified during the inspection, as well as recommendations for resolving

7  those conditions.  Id. at § 8516(b).  Unlicensed individuals, by contrast, are strictly prohibited from

8  making such representations and recommendations, including "making any claims of pest control

9  safety or pest control efficacy," id. at § 8550(c), or "offer[ing] any opinion, or [making] any

10  recommendation, concerning the need for structural pest control work," id. at § 8550(d).

11  It is evident that the California legislature understood that a salesperson's representations

12  concerning the presence of pests or termites and the efficacy of treatments are often highly

13  persuasive to potential customers and thus highly effective at securing sales, and that the pest control

14  laws were enacted to ensure that such representations are legitimate and based on actual facts, and

15  not trumped up charlatan scare tactics.  The pest control laws therefore directly regulate these

16  representational activities.  In fact, California law not only treats inspections and inspection findings

17  as a naturally included element of pest or termite control sales pitches, but it actually requires that

18  they be included in every pest or termite control sales pitch.  While this does not necessarily mean

19  that every Field Representative automatically qualifies as an exempt outside salesperson under

20  California's quantitative analysis, or that every pest or termite inspection is necessarily always

21  related to an attempted sale, it does show that, as a general matter, California law recognizes that the

22  inspections performed by Field Representatives are integrally related to, and should be treated as,

23  sales activity.

24  Nor is this conclusion particularly surprising.  It is classic outside sales activity for a door-to-

25  door salesperson to demonstrate a product before trying to sell it.  A vacuum salesperson, for

26  example, will often ask a prospective customer to identify a dirty carpet so that the vacuum's

27  efficacy can be demonstrated by cleaning it.  Such a demonstration is unquestionably sales activity.

28  Other types of products and services may require an outside salesperson to perform an examination

20

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

or an inspection instead of, or in addition to, an actual demonstration. A hat salesperson may need to measure a prospective customer's head in order to select a hat that will fit comfortably when the customer tries it on. A salesperson who sells water filtration systems may take a sample of a prospective customer's home tap water and chemically test it in a jar to demonstrate the presence of unhealthy elements in the water. Or a home alarm system salesperson may inspect a house to identify points of particular vulnerability to burglars and then point out those vulnerabilities to the prospective customer in attempt to sell an alarm system. Pest and termite inspections performed by Field Representatives such as Coursey fit very comfortably within this traditional outside sales framework.

4. **The Undisputed Facts Show That Coursey's Inspections Were Intended To And Did Directly Foster Her Own Sales**

Coursey's inspections clearly qualify as sales activity within the meaning of California law. Coursey testified that her purpose in doing termite inspections was "[t]o try to find termites or something other than that <u>that I could make some money on</u>." (Coursey Dep. at 91:3-11 (emphasis added).) Even though Coursey was not paid anything at all for doing standard inspections, she constantly tried to schedule additional inspections, *id*. at 238:23-239:3 ("If I had less appointments, I was always trying to make more appointments"), because she knew that inspections were essential for her to close more sales and make more money. (*Id*. at 91:3-11.) When Coursey went door to door prospecting for new customers, she typically initiated conversations with prospective customers by noting there was a possibility they might have an infestation and then offering to do a free inspection. (*Id*. at 132:2-5.)

As soon as an inspection was complete, Coursey "would find the customer and walk them around and show them any areas that I could that I have found, and talk with the customer about my findings and, if necessary, treatment." (*Id*. at 186:7-10.) As Coursey conducted the inspection she took detailed notes on what she found and where, so that she could then show the findings to the customer in hopes of making a sale. (*Id*. at 192:17-193:11.) Coursey attempted to sell TMX services to the customer to address whatever conditions she found. (*Id*. at 200:15-201:12.) Coursey's findings during inspections ranged from termite or pest infestations to conducive

conditions to shower leaks requiring repair work, any and all of which enabled her to sell TMX

services.  (*Id*. at 186:11-189:15.)  If Coursey found evidence of infestation during an inspection, she

attempted to make money by selling treatment services.  (*Id*. at 91:12-21.)  If Coursey did not find

evidence of infestation during an inspection, she attempted to make money by selling a preventative

plan.  (*Id*.)  Even if Coursey identified an infestation or one or more conducive conditions during an

inspection, however, it would not automatically result in a sale.  Rather, salesmanship and

persuasion were necessary to close the deal.  Competition between California termite and pest

control companies is fierce; most such companies offer free inspections as an inducement to gain

entry to sell services[5]; and absent the right sales pitch, a prospective customer with an identified

condition might well hire a competing service to provide the actual treatment.  If Coursey did sell a

service, she would write up a contract for the customer, which she estimated took between three and

ten minutes.  (*Id*. at 208:15-209:5.)

Based on these undisputed facts, all of which are taken directly from Coursey's own

testimony, there can be no question that inspections were a critical part of Coursey's sales routine,

and that she used the inspections to directly foster and promote her own sales.  The inspections

therefore qualify as sales activity under California law.  *Ramirez*, 20 Cal.4th at 801.

D.  **Coursey's Inspection Reports Qualify As Sales Activity**

Inspection reports play a key role in the sale of TMX services, both as a practical matter and

as a matter of California law.  First, inspection reports help Field Representatives such as Coursey

close sales.  Coursey testified that it was in fact her standard practice to re-contact customers after

she completed an inspection in an attempt to close a sale.  (Coursey Dep. at 209:6-17.)  Coursey

further testified that she used conditions she indentified during inspections to sell TMX services.

(*Id*. at 91:3-11, 200:20-201:12.)  Inspection reports, which detail conditions indentified by the Field

Representative and make recommendations as to how to address them, "are a significant part of the

selling process and increase the probability of a sale because they can get the Terminix Field

---

[5] *See, e.g.,* Accuracy Plus Termite and Pest Control, *at* http://www.accuracypluscalifornia.com;
Admiral Pest Control*, at* http://www.admiralpest.com/orange-county-termite-control; Anacapa
Termite & Pest Control, Inc., *at* http://www.anacapatermite.com/201008/ipm/index.asp; Delk Pest
Control, *at* http://www.delkpestcontrol.com; http://california.uscity.net/Pest_Control/ (listing
numerous other termite and pest control companies in California that offer free inspections).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

1   Representatives in front of the prospect again, another opportunity to touch the prospect and sell."

2   (Zoltners Dec. at ¶ 21.)  In fact, California law requires that inspection reports indicate "the

3   approximate location of any infested or infected areas evident, and the parts of the structure where

4   conditions that would ordinarily subject those parts to attack by wood destroying pests or organisms

5   exist," as well as "[r]ecommendations for corrective measures."  Cal. Bus. & Prof. Code §

6   8516(b)(7), (10).  These reports, which must by law be provided to the homeowner within 10

7   business days after the inspection, *id.* § 8516.5, thus serve to reinforce in writing the findings that

8   were orally reported immediately after the inspection, thereby directly fostering the sale of corrective

9   services.

10       Second, similar to the time Coursey spent driving to appointments, Coursey's completion of

11   inspection reports was an essential element of the sales process.  Under California law, no work

12   relating to wood-destroying pests can be commenced on any property until an inspection report has

13   been delivered to the homeowner.  *Id.* § 8516(b).  Moreover, any work contract, agreement, bill, or

14   other document used by a provider of termite and pest control services must, as a matter of law,

15   specifically refer to an inspection report if the document expresses any opinion "relating to the

16   presence or absence of wood destroying pests or organisms or nondecay fungi."  *Id.* § 8517.  In

17   other words, selling termite and pest control services is entirely inseparable from filling out

18   inspection reports.  In *Ramirez*, the California Supreme Court ruled that time spent on activities that

19   are necessary to effectuate a sale, "such as preparation, travel time, and paperwork" should be

20   counted as time spent "selling."  *Ramirez*, 20 Cal.4th at 801.  The time Coursey spent filling out

21   inspection reports falls squarely within *Ramirez*'s ruling concerning sales-related paperwork, and

22   that time accordingly must be counted as time spent selling.[6]

23

24

---

25   [6] Coursey's missed meal and rest period claims are premised on her theory that she was misclassified
     as exempt from overtime.  Since her overtime claim fails because she was properly classified as
26   exempt, Coursey is not entitled to meal and rest periods as a matter of law.  *See* IWC Wage Order
     No. 5-2001.  In addition, her claim that she was not provided with accurate wage statements is
27   premised on the argument that she was not paid for all wages due as a result of misclassification.
     Consequently, her claim for inaccurate wage statements fails as well. *See, e.g.*, *White v. Starbucks
     Corp.*, 497 F. Supp. 2d 1080 (N.D. Cal. 2007).
28

IV.     **CONCLUSION**

TMX is entitled to summary adjudication on Coursey's overtime, meal and rest break, and wage statement claims, each of which depends on her having been misclassified as exempt.

Dated:  September 28, 2010                    WINSTON & STRAWN LLP

                                              By:   s/ Joan B. Tucker Fife
                                                    Joan B.Tucker Fife
                                                    Attorneys for Defendants,
                                                    SERVICEMASTER GLOBAL HOLDINGS,
                                                    INC., THE SERVICEMASTER COMPANY,
                                                    INC., THE TERMINIX INTERNATIONAL
                                                    COMPANY, L.P., AND TERMINIX
                                                    INTERNATIONAL, INC.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT THEREOF   Case No. 3:08-cv-03894-SI