# EXHIBIT I

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   RUBEN PABLO, on Behalf of)
    Himself and All Others   )
5   Similarly Situated,      )
                             )
6        Plaintiff,          )
                             )
7        vs.                 ) Case No. C 08-03894 SI
                             )
8   SERVICEMASTER GLOBAL     )
    HOLDINGS, INC., et al.,  )
9                            )
         Defendants.         )
10  _____)

11

12

13

14          DEPOSITION OF HELIO COSTA

15          Held at HERSH & HERSH

16        601 Van Ness Avenue, Suite 2080

17          San Francisco, California

18        Thursday, November 19, 2009

19          10:10 a.m. - 2:53 p.m.

20

21

22

23

24
    Reported by:
25  Rick Galten, CSR No. 13202

2

BARKLEY
Court Reporters

1    Q.      Were there some months when you pulled so much

2    that you think it exceeded your costs?

3    A.      Yeah -- yes.

4    Q.      And so I believe you testified earlier --

5    correct me if I'm wrong -- that you thought that it was

6    awash; is that right?

7    A.      There was times that I felt that yeah, it was

8    awash.

9    Q.      Okay.

10   A.      And that was just in my own thought.  You know,

11   I mean, if you want to put it down as statistics, it

12   probably shows I get cheated.  But for me it was awash.

13   Q.      Okay.  But you have no concrete evidence either

14   way, correct?

15   A.      No.

16   Q.      Okay.  You testified earlier that you typically

17   left the branch between 9:00 and 9:30 a.m.  would that

18   also depend on when the -- when your first sales call

19   was scheduled for?

20   A.      Yes.

21   Q.      Okay.  So if you had a sales call scheduled

22   earlier -- for example, a customer needed you to be

23   there at 7:30 or 8:00 -- could you go there at 7:30 or

24   8:00?

25   A.      Yes.

221

Helio Costa

BARKLEY
Court Reporters

1                     DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA        )
                                ) ss.
3    COUNTY OF SAN FRANCISCO     )

4

5

6         I, Rick Galten , hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 13202 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                         / / /


                              244

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3       Before completion of the deposition, review of

4  the transcript [XX] was [ ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: DECEMBER 4, 2009.

10

11

12         _____

13

14

15

16

17

18

19

20

21

22

23

24

25

245

Helio Costa

BARKLEY
Court Reporters

# EXHIBIT J

## SECOND SUPPLEMENTAL DECLARATION
## OF NICHOLAS ANNICCHIARICO

I, Nicholas Annicchiarico, declare as follows:

1.    I was employed by Defendants Terminix and worked at its California branches in Long Beach and Santa Fe Springs, California from on or about September 29, 2008 until July 22, 2009.  Before I worked as a Termite Inspector, I was trained for about four months as a Terminix "Sales Manager," and I was taught company policies regarding the job duties and expectations of employees I would manage, including Termite Inspectors.   I worked as a Termite Inspector from on or about February, 2009 until I left my job and moved back to New Jersey, where I live now.

2.    While I still worked for Terminix, I was asked to meet with my employer's lawyer at the Long Beach branch office in Gardena, California.  I was told the meeting was not required and it was my choice to participate.

3.    When I met with my employer's lawyer, she said there was a lawsuit by a former employee who was unhappy about his pay.  She said it was a bad case and probably would be dismissed. Based on her tone of voice and what she said, I thought it must be a frivolous lawsuit.  She said she would interview me and prepare a declaration for me to sign, which would be used in the case.  She did not say she wanted to interview me in regard to a class action lawsuit for overtime on behalf of current and former Termite Inspectors. She said nothing about overtime pay.  She did not tell me that I could be a potential member of the class.  She did not tell me the interests of my employer in this case were or could become adverse to my own interests.  She did not inform me that if the action were successful I might be eligible to recover overtime pay, that my declaration could be used against the interests of the potential class, including myself, or that I could seek the advice of an attorney before I was interviewed.  Although I was told my meeting with the attorney and my cooperation were completely voluntary, of course I nevertheless felt I had to do what

HERSH AND HERSH
A Professional Corporation

my employer requested, especially when it was defending itself against a frivolous lawsuit.

4.      The attorney asked me questions about my work and my duties as a Termite Inspector. I just truthfully answered whatever she asked. She listened to my responses and typed the declaration on a laptop during the interview. She read it to me and then she asked me to sign the last page, which I did. She did not allow me to have a copy.

5.  On June 17, 2009, I signed the "Declaration of Nicholas Annicchiarico" prepared by my employer's attorney. This Supplemental Declaration adds the facts that should have been included in it.    The original declaration I signed was truthful but incomplete. It omitted certain important facts, because I was not asked about them. I reviewed my original declaration and I respectfully submit the following additional facts:

6.      I spent at least 70% of my work hours as a Termite Inspector for Terminix on non-outside sales activities, which included but were not limited to termite inspections, termite reports, meetings at the branch office, telephone calls from the branch office, and other non-outside sales activities performed to the best of my ability in conformance with company policy and in compliance with my California Field Representative Branch 3 license. More than half my time was spent on inspections and termite reports alone.   I spent only 30% or less of my work hours outside the office prospecting, selling, and preparing contracts for customers. My prior Declaration stated I spent at least 70% of my work time outside the branch and my home engaged in sales activities. But I made that statement, because my employer always told me inspections, termite reports and driving were all "sales activities." Decl. of Nicholas Annicchiarico in Supp. of Defs. Op. (Annicchiarico Decl )(ex.2 in

Defs. Compendium of Evidence) ¶43. (Hereinafter all ¶¶ ref. are to Annicchiarico Decl.).

7.    In my prior declaration I referred to myself as an "Outside Sales Professional." See, eg., ¶ 1. But my employer, co-workers and I also called my job title and position "Termite Inspector." I was aware many of my co-workers listed their position as 'Termite Inspector" on their Terminix business cards. While all the statements in my declaration are true and correct, I did emphasize what I understood were outside sales activities, including site inspections, preparing termite reports, to impress my employer, because at my interview, the attorney always referred to me as an "outside sales professional."

8.    Uniform Terminix policies in California controlled the conduct of my duties and work methods as a Termite Inspector. The uniform work duties policies were uniformly applied to me and all the Termite Inspectors in my branch. Additionally, the methods and requirements for termite inspections and reports were mandated by California law. The methods and requirements had nothing to do with sales and sales techniques. Once I did an inspection, anyone could sell Terminix products and services. It was my understanding and belief that Terminix policies on job duties of Termite Inspectors reflected these legal requirements in California. My prior declaration said, "In order to make sales, I have to offer free home inspections, in which I search for wood destroying organisms and pests. I also draft free reports of my findings, which I use as a sales tool to sell the treatments that Terminix offers." ¶ 7. That was true, but the inspections and reports were not really sales tools. In fact, I could not use the termite report as a "sales tool," because it was prepared after I inspected and made my pitch. I was not allowed to talk about Terminix products and services prior to completing the inspection. My license, California law and Terminix policy required me to conduct inspections in a uniform, thorough manner and to

3

prepare a detailed, multi-page termite report for every inspection I performed, regardless of whether I sold anything. Conducting Inspections and preparing termite reports consumed more than half my work hours.

9. My prior declaration said," I am responsible for creating my own work schedule and can work as much as I want." ¶ 12. See ¶¶ 13, 26  In fact I controlled my own schedule only to the extent I met Terminix policies, requirements and expectations.  My employer told me I could work as much as I want, but in fact it expected and required at least five inspections per day on my schedule. It expected me to perform at least four inspections daily. The company required inspections scheduled every two hours or less:  Typically, my printout had five appointments, eg.,:  8:00am-10:00am, 10am-12:00 noon, 12:00 noon-2:00pm. 2:00pm-4:00pm. 4:00pm-6:00pm.  Sometimes scheduled appointment times overlapped if I had extra appointments during swarm season or when I had to undertake reinspections , which were not counted as one of the five mandatory "sales calls."    In addition, it was mandatory to work on Saturdays twice a month and in the evenings at the office twice a week.  I could chose to work even more, and I did work almost every Saturday, for example, because otherwise it was impossible for me to get all the paper work done and meet my sales quota. (My sales quota required me to sell enough to match my monthly base pay, or I would make no commission.  If I sold less than my base, and this "deficit" and the difference would be deducted from my future commission earnings).  Thus, I had to draw up and execute a schedule of appointments within my employer's rigid policy and demands regarding the minimum number of inspections I had to conduct daily.

10. In my prior June 17 declaration, the term "sales call" referred  to all my work activities—labor as well as sales -- during entire the time I was at the site. See, e.g., ¶¶13, 14, 16.  "I understood sales call" in that way, because I was told

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

4

HERSH AND HERSH
A Professional Corporation

everything I did at an inspection site was a "sales activity." In fact the majority of my time at the site was spent doing the termite inspection and preparing the initial termite report. At a job site I typically spent at least 1½ hours on labor, which included inspecting the entire structure, crawling around underneath it with a flashlight, measuring, drawing a diagram of the structure and surrounding trees on graph paper, writing up initial findings, donning and doffing protective clothing, washing up, and unloading and reloading tools from my vehicle. I typically spent only 30-45 minutes making a sales pitch, calculating the linear and cubic footage and price, and possibly preparing and explaining the contract (if I made a sale and I did not have to get to my next appointment immediately). I sold a contract for approximately 30-45% of my inspections. ¶29.

11. My prior declaration said, "the more sales calls I schedule, the more money I can make." ¶ 14. But my long work hours usually did not, in fact, result in higher wages. Theoretically, the more inspections I did the more opportunity I had to sell Terminix services and earn a commission in addition to my base pay, but in reality the duties of performing inspections and writing termite reports, as well as time required to attend meetings, drive, and make in office sales calls limited the number of site inspections I could perform. I tried to create more opportunities to earn commissions by working hard, but each inspection required preparation of a termite report regardless of the sale of termite services, so the more inspections I did, the more time I had to spend preparing termite reports for submission the next day.

12. As my prior Declaration said, I worked between fifty-five and sixty-five hours per week. ¶15. I was required to and did work more than eight hours in a day and/ or more than forty hours in a week. I spent at least 70% of my total work hours on activities other than outside sales. I arrived at the office between 7:00 and 7:30 am to work on reports before the mandatory 8:00 am meeting. The meeting

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

5

Case3:08-cv-03894-SI Document208 Filed06/26/11 Page12of23

usually ended at 8:30 or 9:00 am, and then I had to wait for my turn to check in with my manager and give him my completed termite reports. I conducted typically and on average three or four inspections every day. Every day I worked on termite reports on site and at home after my last inspection of the day. Twice a week on Monday and Thursday evenings I had to go back to the office after a full day of inspections for at least three hours and call prospective customers with offers of free termite inspections as well as confirm the next day's appointments. ¶31. The night work at the office was mandatory for all Termite Inspectors. Also, I had two –five fumigations per week, where I had to be present at the site for an hour and a half typically. Often I had to help the homeowner pack food into fumigation bags, which I supplied. Usually I did not get home until 8:00 pm. each day. But however many inspections I performed each day-- as few as two or as many as eight— whether I had time to conduct a full one or two hour inspection or only a "limited" thirty-minute inspection, and however many hours I worked in a day, far more than half my work hours every day and every week was always spent on inspections, termite reports, branch office meetings, branch office telephone calls and other labor or non-outside sales activities. See ¶¶ 15, 17, 18, 33, 35.

13.    I spent less than 30% or less of my time everyday and every week outside the office trying to sell the customer termite services, preparing and explaining contracts for services, and prospecting for customers. Typically I spent about a half hour after my inspection pitching the customer Terminix services. But sometimes I spent only five minutes. Sometimes I did not make a pitch, because I had to get to my next appointment. Then I would come back in the evening to meet with the customer. At most I spent two hours a day outside the office selling to customers, including preparing and explaining a contract if I made the sale. Prospecting outside the office included "cloverleafing" (hanging door knob flyers), knocking on doors,

HERSHANDHERSH
A Professional Corporation

asking for referrals, and talking to the public. See ¶¶ 20, 22, 25. Twice I followed a pest technician on his route and distributed flyers in his territory. ¶25. Also, if I had time between inspection appointments because of a last minute cancelations, I -called prospective customers from my vehicle. As I stated in my prior declaration, when I gained more experience on the job, I spent less time prospecting for new customers. ¶21. My prior declaration said I tried to set aside 2-8 hours per week to prospect for new customers outside the office, but realistically, I could not actually do much of it. ¶20. The inspections and termite reports took most of my time. Although my employer said I had to do it, prospecting outside the office was not my priority, because it generated very few inspections assigned to me. My prior declaration said I spend extra time prospecting for new customers, which was true, but at most I actually spent fewer than three hours of my fifty-five to sixty-five hour work-week in such prospecting activities. ¶ 35.

14. After I came home each evening, I usually worked on the inspection reports, which were due the morning following the day of the inspection. I worked 6-7 hours a week at home on reports. I occasionally called customers from home as well. ¶32.

15. My prior declaration said in addition to performing inspections for potential new customers, I also did about four "re-inspections" per week for existing termite services customers. ¶36. My duties and work activities on re-inspections were the same as the duties and work activities of other Terminix employees known as "Termite Renewal Inspectors." See ¶36. They performed termite inspections and prepared reports for existing customers only. Like me, they could sell services to existing customers and earned commissions on such sales. See ¶38. Termite Renewal Inspectors were hourly employees, and if they worked overtime they could

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

7

be compensated with overtime pay. For each re-inspection I performed, however, Terminix paid me $10.00. The ten dollars appeared on my pay-stub itemized as "labor." All or most Termite Inspectors at my branch were required to conduct renewal inspections, and Terminix paid them $10 for "labor.

16.     My prior declaration said, "I spend anywhere from 30 minutes to 1.5 hours completing inspections on residential properties." ¶ 41. Also my inspections could take over two hours. To clarify further, a thirty minute inspection was always a "limited inspection." Terminix did not offer the customer a warranty on a limited inspection. It was not possible to do a complete inspection in thirty minutes. 90% of the houses in my territory had subfloors and attics, which took a longer time to inspect than houses built on slab foundations and/or without an attic. Thus, even the smallest houses I had took over an hour to do a complete inspection. My inspection work duties included meeting with the customer, who pointed out areas of suspected infestation; measuring the structure's perimeter with a professional measuring wheel; sketching the perimeter of the house to scale on graph paper noting my observations as I inspected. I inspected and probed the entire perimeter, including garage, any out buildings, all interiors, floors and ceilings, inside closets, bathrooms, and cabinets. I crawled under the structure and into the attic. When I got ready to go below the house, I changed into protective clothing, including coveralls, knee pads, gloves, and shoes. After the sub-area inspection, I removed the protective gear and washed up. Back in my vehicle I wrote up a draft of all my findings. It took me about an additional 5-10 minutes to prepare a cost estimate.

17.     In my prior Declaration, the estimated time required to prepare a termite report totaled at least 30 minutes. See ¶¶39, 40, 41. In addition to drawing the perimeter of the structure to scale on graph paper at the site, I also noted my findings by describing them and marking the places of infestation and or damage on

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

8

my diagram of the house. See ¶37. My notations took about ten minutes. In all, all work on the inspection report could take from at least 30 minutes to up to an hour if there were a lot of findings or if I had to spend an additional ten to fifteen minutes to correct the report after it was typed.

18.    My prior declaration described my sales training. ¶44. In addition, I had to engage in extensive pest control study and training to become licensed to inspect structures for termites and other wood destroying organisms. I studied written materials and videos on the job and at home for two hours a night. I attended nine days of classes. I went out on the job with the Termite Inspectors, and I observed they worked long hours. I did not receive overtime pay for overtime work during my training. On or about November 25, 2008, I obtained my Field Representative Branch 3 license issued by the State of California Consumer Affairs Structural Pest Control Board.

19.    My prior Declaration stated, "I believe that I have been appropriately reimbursed for all of my transportation costs by Terminix." ¶ 49. But I was not reimbursed for all my work related expenses. I was told that I was entitled to a "gas allowance" of 2.5% of my total sales, which I did believe was appropriate. But I did not believe the gas allowance was enough to cover the cost of all the out of pocket expenses I was required to pay in carrying out my work activities for Terminix. When I worked at Terminix, I did not know my employer was supposed to reimburse me for all the costs of my vehicle expenses attributed to my work activities. In fact my gas allowance did not even cover my mileage at 55 cents per mile, and it did not cover my total out of pocket work expenses, including gas, oil, tires, maintenance and repairs. My employer knew my gas allowance did not cover the cost of my vehicle

HERSH AND HERSH
A Professional Corporation

9

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

expense, because I reported my mileage. I was never told I could request reimbursement for my costs above the amount of the gas allowance.

20. In my previous Declaration I stated, "I almost always take my rest breaks and take at least a 30-minute meal period . . . . and when I don't it's my choice not to." ¶52. That is true, but when I had lunch it was in my vehicle while I was driving to my next appointment. I was not eating while driving or doing other work by my choice, but because my employer required me to have a minimum of five appointments scheduled back to back and often overlapping. I estimate I took a meal break without having to also drive, work on reports, or make calls to customers once a week. I thought I was on a "rest break," if I wasn't doing physical work and was just talking to my co-workers about work. I did not have time to take rest breaks when I was out in the field.

21. On October 29, I received a telephone call from on e of the Plaintiffs' attorneys in this case. She said she was one of the attorneys representing Termite Inspectors in a lawsuit against the company for overtime and other California labor violations. She asked if she could talk with me about my work at Terminix and my June 17 declaration. I agreed. She emailed me copies of the class action lawsuit, individual lawsuit, a declaration by a former Termite Inspector, and my June 17 declaration. I realized my June 17 statement, although true, could be misleading, because of omitted facts. Mrs. Hallinan interviewed me and prepared a draft of a Supplemental Declaration, which she emailed to me for my review, which I did and signed. This Supplemental Declaration II was again reviewed by me, and I added some facts that were omitted from the first Supplemental Declaration.

I carefully read and understand this Supplemental Declaration and declare under penalty of perjury that the foregoing is true and correct, except for what is

10

SUPPLEMENTAL DECLARATION OF NICHOLAS ANNICCHIARICO

1    stated upon my information and belief, and as to those things I believe them to be

2    true, and this declaration was executed on ___12-1___,2010, New Jersey.

3

4

5    By: ___[signature]___

6         NICHOLAS ANNICCHIARICO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HERSHANDHERSH
A Professional Corporation

# EXHIBIT K

1                              **DECLARATION OF MOISES ESTRATA**

2    I, Moises Estrata , declare as follows:

3            1.      I am currently an Outside Salesperson Professional ("OSP") for Terminix

4    International Co. L.P. ("Terminix"). I have personal knowledge of the facts set forth in this

5    declaration, and if called as a witness, could and would testify competently thereto, under oath.

6            2.      This Declaration is a voluntary statement made by me. I have carefully read this

7    Declaration, and fully understand its contents. Neither Terminix nor any employee or agent of

8    Terminix has required me to make this statement. There have been no threats made to me

9    concerning my employment, express or implied, in order to induce me to make this statement.

10    There also have been no express or implied promises of employment or other benefits made to

11    induce me to make this statement. I have made this Declaration only for the purpose of stating

12    true facts regarding my employment at Terminix.

13            3.      During this interview, the attorney I spoke to advised me that she represented

14    Terminix and did not represent me individually.

15            4.      I have been employed by Terminix as an OSP for the Rancho Cucamonga

16    Terminix branch for approximately one year. I have not held any other positions or worked in

17    any other branches for Terminix.

18            5.      As an OSP, I am a salesman for the company and am required and do spend more

19    than 50% of my work time engaged in sales activities outside of the office and my home.

20            6.      Before I accepted the OSP position, I fully understood that I would be paid on a

21    100% commission basis with a $2000 draw against commissions, and would earn no money

22    unless I made sales for the Company.

23            7.      As an OSP, my primary job duty is to sell Terminix's termite and pest control

24    services and protection plans to customers within my assigned territory.

25            8.      Terminix does not allow me to conduct any of the services that I sell. Instead, the

26    company has other trained professionals who take care of the services that I sell. My only duty

27    is to make the sale and schedule the appointment for the services that I sell.

28            9.      As an OSP, I am expected to prospect for my own potential customers and to

1  schedule myself for at least 5 sales calls per work day.  That being said, it is not uncommon to
2  have customers cancel or reschedule their services leaving me with fewer than 5 sales calls in a
3  workday.  For example, yesterday, I had several cancellations and was only left with 1 sales call
4  to complete.  On those types of days, I typically spend the remainder of my workday canvassing
5  neighborhoods, clover leafing, making telephone calls to potential customers from the field and
6  following up with homeowners for whom I have already completed a sales call for but who have
7  not yet committed to purchasing a service from Terminix.

8        10.    A sales call consists of 1) an initial meeting with the homeowner to discuss what I
9  will be doing at the property to identify if termite or pest control services are needed; 2) a
10  physical sales inspection of the home so that I can determine what Terminix products and
11  services might be able to benefit the homeowner; 3) preparing a graph and report of the home
12  that identify areas of concern so that the customer can physically see why certain services are
13  needed; 4) preparing a proposal for the homeowner of the products and services that I want to
14  sell him or her; 5) having a discussion with the homeowner about what I found and offering the
15  services that I think make most sense for him or her; 6) negotiating pricing with the homeowner
16  and offering financing options; and 7) finalizing the sales and scheduling the services purchased.
17  All of these activities, including the physical sales inspection and the report-writing, are
18  necessary sales activities that I must do if I want to make a sale.

19        11.    Without the physical sales inspections it is impossible for me to make sales
20  because I wouldn't know what services are necessary and appropriate to sell to the homeowner.
21  By doing a physical inspection of the property, I am able to point out the areas of concern on
22  their property and show them why the services that I offer are necessary.

23        12.    Likewise, the reports that I prepare for each customer also work as a sales tool for
24  me because customers often use those reports to navigate the problem areas of their property and
25  compare what I found against what my competitors found.

26        13.    Because I find that the physical sales inspection is such an important sales tool, I
27  always invite homeowners to accompany me on the physical sales inspection.  Even when they
28  choose not to accompany me, I always point out to them the areas of concern that I found.

14. The time that I spend conducting the physical sales inspection of the property can take me anywhere from 15 minutes to 45 minutes, depending on the size of the home, the structure of the home, the extent of the damage found and whether or not the homeowner accompanies me on the physical inspection of the property.  When homeowners accompany me on the physical inspection of their property, I often spend more time conducting the physical sales inspection.  I don't mind however, because I use that opportunity as an extended sales pitch.

15. The amount of time that I spend preparing and finalizing reports varies from day to day depending on how many I have to complete and the extent of the damage found on the homes that I am preparing the reports for.  Each report takes me anywhere from 15 minutes to 30 minutes to complete.

16. Throughout my employment with Terminix, I have been given extensive sales training.  I have been encouraged to take my time with each customer to make sure that they understand Terminix's services and why they are necessary.  As a matter of fact, I can reschedule any appointments that I need to to accommodate customers who require more time.

17. In my experience, the more time that I spend with each customer the stronger rapport I am able to build with them and the greater chance that I have of making a sale.  As such, I always try to spend as much time as I can with interested homeowners.

18. I always meet with the customer before I conduct my physical sales inspection of the property to discuss what I will be doing at the property.  This typically lasts anywhere from 5 minutes to 10 minutes.  I also always meet with the customer after I conduct the physical sales inspection of the property to review what I find, suggest services to the homeowner and close the sale.  This meeting with the customer takes anywhere from 45 minutes to 3 hours depending on how many questions the customer has, if the customer asks to see the locations of the damage and/or if I am able to make a sale on the spot.

19. When I am able to make a sale on the spot, I often have to spend additional time with the homeowner to offer various financing options, negotiate the sales price and schedule a day for the services.

20. When homeowners do not commit to purchasing a service right away, I must

145

1  spend time following up with them on a later date to review their formal report with them and

2  give further explanation as to why they should commit to the Terminix services that I have

3  offered to them.  I always try to designate a few hours of my day to do this type of activity.

4       21.     Often times, customers will require that I revisit their property before they

5  commit to one of the services that I am selling them.  When this happens, I reschedule my sales

6  calls appointments to make time to revisit the customer and close the sale.

7       22.     At the Rancho Cucamonga Terminix branch, inbound sales leads are distributed

8  to OSPs who have the highest closing percentages first, and then get given to other OSPs.

9       23.     During the summer months, I received several inbound leads per work day.

10  Recently, my closing percentage has gone down and now I only receive about 1 to 2 inbound

11  sales leads per work week.  As such, I now have to spend more time trying to find creative sales

12  leads for myself than I did in the summer.

13       24.     I prefer to have inbound sales lead sales calls, as opposed to creative sales lead

14  sales calls, because the creative sales calls typically cancel more often than the inbound sales

15  lead sales calls.  This is because the inbound sales lead sales calls come from homeowners who

16  have typically seen termite activity and are specifically requesting that Terminix come out to

17  determine what services they need.

18       25.     I designate work time before, after and in between sales calls to prospect for new

19  customers.  Some of the things that I do include passing out flyers to homeowners, making

20  telephone calls to existing customers to ask for referral business, meeting with homeowners

21  whom I have already completed a sales call for but who have not yet committed to Terminix's

22  services, and following around other pest control company vehicles and leaving my business

23  cards and brochures with homeowners who I saw them visit with.

24       26.     The amount of hours that I work varies from day to day and from week to week

25  depending on how many sales calls I have.  Nevertheless, on most weeks, I think that if you take

26  out the report writing and physical part of the sales inspection where no homeowner

27  accompanies me on the inspection, I spend more than half of my time engaged in face to face

28  sales, solicitations and other sales related activities in the field.

27.     It was my decision to sign this declaration and I fully understood that doing so was voluntary.

I declare under the penalty of perjury of the laws of the United States of America and the state of California that the foregoing is true and correct and that this declaration was executed on November 10, 2009, at RANCHO CUGANONGA California.

Moises Estrata

LA:246533.2

**147**